UNITED STATES v. DETROIT TIMBER & LUMBER CO. et al.

(Circuit Court, W. D. Arkansas, Texarkana Division.   July 31, 1903.)

1. PUBLIC LANDS—SUITS FOR CANCELLATION OF PATENTS FOR FRAUD—MEASURE OF PROOF REQUIRED.

The rule that one who alleges fraud must prove it by satisfactory evidence, which is more than a bare preponderance, and sufficient to overcome the presumption of fact in favor of the honesty of the transaction, applies as well to suits in equity as to actions at law, and with especial force to suits by the United States to cancel patents to lands which have been issued in conformity to the prescribed rules and regulations of the Land Department.

2. SAME—VALIDITY OF ENTRIES—TIMBER AND STONE ACT.

The fact that a lumber company lent money without security to persons to enable them to enter and pay for land under the timber and stone act, in the expectation that when the entrymen obtained title it would be enabled to buy the timber from such lands by reason of the fact that it had the only mill in the vicinity, does not render the entries invalid for fraud, where there was no agreement for the sale prior to the entries, but each man was free to keep the timber or to sell it to others; nor are such entries invalid as made on "speculation" because the persons making them did so with the intention of selling the timber for their own benefit.

In Equity.   Suit to cancel patents to lands.

James K. Barnes, U. S. Dist. Atty., and F. A. Youmans, Asst. U. S. Dist. Atty., for complainant.

Rose, Hemingway & Rose, Thomas C. McRae, and Read & McDonough, for defendants.

ROGERS, District Judge.   This is a bill in equity, filed by the United States, by authority of the Attorney General, to cancel certain patents issued by the United States to the defendants other than the Detroit Timber & Lumber Company and the Martin-Alexander Lumber Company.   Detroit Timber & Lumber Company occupies the position of an innocent purchaser from the Martin-Alexander Lumber Company and some of the other defendants, and in the view entertained by the court may be eliminated from any further notice in the opinion.   In referring hereafter to "the codefendants" of the Martin-Alexander Lumber Company, it will be understood that no reference is made to Detroit Timber & Lumber Company unless it is specially named.   The bill in this case was filed on the 7th day of April, 1902.   All the lands in controversy were patented

to the codefendants of the Martin-Alexander Lumber Company prior to the 1st of June, 1901. The record shows that the several entrymen who are codefendants of the Martin-Alexander Lumber Company applied to the proper land office at Camden, Ark., to purchase the lands in controversy, and having complied in all respects with the requirements of the statute, paid the purchase price, and received their receipts therefor, and the patents were thereafter issued in the usual and ordinary course of business. The entries were all made under what is known as the "Stone and Timber Act" of June 3, 1878, c. 151, 20 Stat. 89, as amended by the act of August 4, 1892, c. 375, § 2, 27 Stat. 348 [U. S. Comp. St. 1901, p. 1545], the effect of which last act was to extend the provisions of the first act to all the public lands in the United States. Section 1 of the act of June 3, 1878, provides:

"That surveyed public lands * * * valuable chiefly for timber, but unfit for cultivation, and which have not been offered at public sale according to law may be sold * * * in quantities not exceeding one hundred and sixty acres to anyone * * * at the minimum price of two dollars and fifty cents per acre; and lands valuable chiefly for stone may be sold on the same terms as timber lands."

Section 2, so far as it is applicable to the case at bar, is as follows:

"Sec. 2. That any person desiring to avail himself of the provisions of this act, shall file with the register of the proper district a written statement in duplicate, one of which is to be transmitted to the General Land Office, designating by legal subdivisions the particular tract of land he desires to purchase, setting forth that the same is unfit for cultivation and valuable chiefly for its timber or stone; * * * that deponent has made no other application under this act; that he does not apply to purchase the same on speculation but in good faith to appropriate it to his own exclusive use and benefit; and that he has not, directly or indirectly, made any agreement or contract, in any way or manner, with any person or persons whatsoever, by which the title which he might acquire from the government of the United States should inure, in whole or in part, to the benefit of any person except himself; which statement must be verified by the oath of the applicant before the register or receiver of the land office within the district where the land is situated; and if any person taking such oath shall swear falsely in the premises, he shall be subject to all the pains and penalties of perjury and shall forfeit the money which he may have paid for said lands and all right and title to the same; and any grant or conveyance which he may have made, except in the hands of bona fide purchasers, shall be null and void."

The third section of said act, so far as here applicable, is as follows:

"Sec. 3. That upon the filing of said statement * * * the register of the land office shall post a notice of such application, embracing a description of the land by legal subdivisions, in his office, for a period of sixty days, and shall furnish such applicant a copy of the same for publication, at the expense of the applicant, in a newspaper published nearest the location of the premises for a like period of time; and after the expiration of said sixty days, if no adverse claim shall have been filed, the person desiring to purchase shall furnish to the register of the land office satisfactory evidence, first, that said notice of the application prepared by the register as aforesaid was duly published in a newspaper as herein required; secondly, that the land is of the character contemplated in this act * * * and upon payment to the proper officer of the purchase money of said land, together with the fees of the register and the receiver, as provided for in case of mining claims in the twelfth section of the act approved May tenth, eighteen hundred and seventy-two, the applicant may be permitted to enter said tract, and, on the

transmission to the General Land Office of the papers and testimony in the case, a patent shall issue thereon."

This bill was filed to vacate these patents upon one of two grounds: First. That there was a conspiracy between Elmer B. Martin and Arch. V. Alexander, president and secretary, respectively, of the Martin-Alexander Lumber Company, and Jim P. Copeland, an employé of said company, and also an entryman, with their codefendants, who were entrymen, to induce and procure the entrymen fraudulently to make application to the land office of the United States at Camden, Ark., to enter each a separate portion of the said land, and that before said entries were made by said entrymen they had each entered into an agreement with the Martin-Alexander Lumber Company that each and every entry so made should be made for the use and benefit of the said Martin-Alexander Lumber Company, and that on the issuance of the receiver's receipts that each entryman should at once execute to the said Martin-Alexander Lumber Company a conveyance to it of all the timber and trees standing and growing upon the lands so entered, with certain other rights and privileges in the nature of easements upon said land. Second. That if such agreement and conspiracy did not exist, that each and every of said entrymen made his or her said entry on speculation, and not in good faith for the purpose of appropriating the same to his or her own use and benefit, which was well known to the said Martin-Alexander Lumber Company, and said Martin-Alexander Lumber Company aided and assisted each and every one of said entrymen in the accomplishment of said purpose, to wit, the entering of said lands on speculation. To this last allegation, which was an amendment, a demurrer was entered, and a stipulation filed to the effect that, if the demurrer was overruled, the answer on file to the original complaint should be treated as applying to this allegation. The court overrules the demurrer, and will treat this allegation as denied by the original answer on file, in accordance with the stipulation. Each of the defendant entrymen answered, denying specifically the allegations of fact in the complainant's bill of complaint in so far as it alleged any fraudulent conduct upon their part, and each of the entrymen affirmed that the affidavits which they had made at the land office were true, and that the lands were purchased for their own use and benefit, and so appropriated. The Martin-Alexander Lumber Company and Detroit Timber & Lumber Company denied the allegations of fraud, and the latter also set up that it was an innocent purchaser. To these answers a replication was filed, and the case submitted upon pleadings and written proof. The record is most voluminous, and it is unnecessary to go into details. Two questions arise on this record: First. Is there such a combination or conspiracy shown to have existed between the Martin-Alexander Lumber Company and their codefendants (the entrymen) to obtain the lands in controversy for the use and benefit of the Martin-Alexander Lumber Company, as authorizes the annulment of the patents issued to the defendant entrymen? Second. Did the several entrymen make their said entries on speculation, and not in good faith, and not for the purpose of appropriating the lands to their

own use and benefit? It will be more convenient to consider both questions together.

The proof in this case develops this state of facts: The Martin-Alexander Lumber Company had established a large sawmill and lumber plant in close proximity to the lands in controversy, and had also become the owners of large bodies of timber land adjacent thereto. There was no other sawmill or lumber plant, at the time these lands were entered, so near thereto as to make it practicable or profitable to cut the timber standing on the lands in controversy. The lands in controversy were not on the market except under the homestead law, and the stone and timber act supra. Naturally the Martin-Alexander Lumber Company wanted all the timber it could get which was convenient to its mill plant. It had in its employ as timber man, or timber inspector, Jim P. Copeland, a resident of Pike City, where its mill plant was located, and he was an old surveyor, as well as real estate man, with large experience and much information in regard to lands in that vicinity; and was also well acquainted with the people residing in that vicinity, and especially with the lands, both public and private, in that county. Early in 1899, E. B. Martin, the president of the Martin-Alexander Lumber Company, who resided in Chicago, inquired of Copeland about timber lands in the county where the mill plant was located. Copeland informed him that there were many public lands in the county and adjacent to the mill plant valuable for their timber, and gave him the approximate amount. Martin then inquired how they could be procured. Copeland then told him they could be homesteaded; but the timber could not be cut until the patent was obtained or the homesteader had resided on the land for the period of five years, and in other respects conformed to the requirements of the homestead law. The proof also shows that these lands were not fit for cultivation, but were only valuable for their timber. Something was then said in reference to scrip which could be used in the entry of the lands. In the course of the conversation Copeland told Martin of the stone and timber act. Prior to this time he had written to the member of Congress, Hon. T. C. McRae, and obtained a copy of it, and afterwards, having occasion to go to Camden, he had laid the law before the land officers, and he and they read it over together, and he obtained their construction of it. He also informed Mr. Martin that he knew of a number of good, honest people in the community who would like to take up land under the stone and timber act if they had the money. Copeland had at that time talked to some men whom he knew personally and favorably, who had expressed a desire to take up land under that act if they could get the money, and he so advised Martin. Martin then told him that they would loan that class of men the money if they would take up the land. Copeland then inquired what security he would demand, and he said simply their note, with 8 per cent. interest. Copeland then hunted up the men that he had talked to, and others also, and others hunted him up, to inquire about the entry of these lands, and he explained to them the law, and told them they could get the money to enter the lands from the Martin-Alexander Lumber Company, without security, and that the

Martin-Alexander Lumber Company would trust to their honor to pay it. He took them and showed them the lands, made them a probable estimate of the timber in the respective tracts, and told them that the timber on the land at 50 cents a thousand feet (which was the market price at that time) would pay more than the land would cost, and told them they could sell the land or the timber after the patents were issued. All the codefendants of the Martin-Alexander Lumber Company, nearly all of whom were employés, or had been, of the company, entered the land under the conditions just above stated. The money was furnished by the Martin-Alexander Lumber Company. Copeland usually went with the parties to examine the land, accompanied them to the land office, and furnished them the money, and they entered the land, made the necessary proofs in conformity with law, and their expenses to the land office and back were paid by the Martin-Alexander Lumber Company, and charged to them upon the books of the company. Either just before the lands were entered and the receipts for the purchase money were obtained, or just afterwards, the money having been furnished to the entrymen by Martin-Alexander Lumber Company, they would execute their notes to the company for the amount, with interest, and in nearly all instances shortly afterwards they sold the timber standing on the land to the Martin-Alexander Lumber Company by a written contract, and the notes were canceled. By the terms of the contract the Martin-Alexander Lumber Company was to pay 50 cents a thousand stumpage for all the timber cut from the land, and the amount which had been loaned by it to enter the land was treated as purchase money advanced on the timber, and, if the value of the timber exceeded the value of the money advanced, with interest, the seller was to get the difference. In some cases the entrymen declined outright to sell at all to the Martin-Alexander Lumber Company, and finally sold to other parties after the patents were issued. In such cases the person purchasing from the entryman was an agent for the Detroit Timber & Lumber Company, and took the deeds in his own name, but gave credit to the entryman for the moneys advanced by the Martin-Alexander Lumber Company to the entryman, and the lands were subsequently conveyed to the Detroit Timber & Lumber Company, which had succeeded the Martin-Alexander Lumber Company by purchase of all its rights and interests in connection with the mill plant and lands. Before any of these lands were entered, the proof shows that Copeland took the law, and he and Martin, and perhaps Alexander, sat down and went over it together, and Copeland explained to them the construction placed upon the law by the land officers, informing them that the applicant would have to make affidavit to the requirements of the statute, and show that he did not make the purchase on speculation, but in good faith, with the intention of appropriating it to his own use and benefit; and that he did not, directly or indirectly, make any contract or agreement in any way or manner with any person or persons whatsoever by which the title which he might acquire from the government of the United States should inure in whole or in part to the benefit of any other person except himself. Both Martin and Alex-

ander knew that Copeland had examined and understood the law, and Copeland had taken advice as to its construction, and imparted that information to Martin and Alexander. He also imparted the same information to the entrymen, and each and all of the entrymen not only made affidavit at the land office, as required by the statute, but nearly all of them, being called by the plaintiff, have testified and corroborated that affidavit by positive testimony, which is part of the record in this case. Alexander and Copeland have also testified substantially to the same facts, and have positively and emphatically denied that there was any agreement or understanding, expressed or implied, prior to the issuance of the final receipts by the land office, whereby the Martin-Alexander Lumber Company should have any interest of any kind whatsoever in regard to the lands or timber on them in controversy; and there is no proof by any witness to the contrary. There are many circumstances in connection with the transaction which are suspicious in their nature, and tend to create the belief that the Martin-Alexander Lumber Company understood, were satisfied, felt sure that the lands would ultimately come into their possession. I have no doubt in my own mind, from all the facts, that it did so believe, and, if it had not so believed, that it would not have advanced the money to the entrymen in order that they might enter the land. As intelligent business men, Martin and Alexander knew that at that time there was no one else who could cut and use the timber but themselves; they knew that the lands were not homesteads, nor susceptible of being made homesteads; they knew that when the patents were issued the lands were not exempt from execution; they knew, if necessary, they could sue upon the notes and recover judgment and sell the land; they knew it was to the interest of the men who had entered them to sell the timber, and they knew that in making the entry the object of the parties was to sell the timber because the land was not fit for cultivation; they knew that the entrymen expected to get more from the timber than the land was worth, because Copeland had told the entrymen about what amount of timber was on the land, and what could be gotten for it at that time, and that more could be realized from the timber than it would take to enter the land; they knew their company could afford to pay more for the timber because their mill was already located in closer proximity to it than any other mill; they knew also that the persons to whom they had loaned the money were honest men, and would desire to pay their debts; they knew, in all reason, that they had no other resources out of which to pay back the borrowed money; they knew, therefore, that in all probability they would ultimately get the timber, and that they could purchase it without any fair competition with others.

Assuming all these things to be true, and that their motive for lending the money and assisting in making the entries was with the hope of ultimately getting the timber, which one of these acts is either violative of the letter or spirit of the timber and stone act? This precise question was before the Supreme Court of the United States in United States v. Budd, 144 U. S. 154, 12 Sup. Ct. 575, 36 L. Ed. 384, in which case Mr. Justice Brewer, delivering the opinion

of the court, quoting from the opinion of Mr. Justice Miller in the Maxwell Land-Grant Case, 121 U. S. 325–381, 7 Sup. Ct. 1015, 1029, 30 L. Ed. 949, laid down the following rule:

"We take the general doctrine to be that when, in a court of equity, it is proposed to set aside, to annul, or to correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal, and convincing, and that it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt. If the proposition, as thus laid down in the cases cited, is sound in regard to the ordinary contracts of private individuals, how much more should it be observed where the attempt is to annul the grants, the patents, and other solemn evidences of title emanating from the government of the United States under its official seal. In this class of cases the respect due to a patent, the presumptions that all the preceding steps required by the law had been observed before its issue, the immense importance and necessity of the stability of titles dependent upon these official instruments, demand that the effort to set·them aside, to annul them, or to correct mistakes in them, should only be successful when the allegations on which this is attempted are clearly stated, and fully sustained by proof. It is not to be admitted that the titles by which so much property in this country and so many rights are held, purporting to emanate from the authoritative action of the officers of the government, and, as in this case, under the seal and signature of the President of the United States himself, shall be dependent upon the hazard of successful resistance to the whims and caprices of every person who chooses to attack them in a court of justice; but it should be well understood that only that class of evidence which commands respect, and that amount of it which produces conviction, shall make such an attempt successful. This case is even stronger in its aspects than some that have been before us, for, if the particular wrong charged upon the defendants be established, the money paid is, by the second section of the act, forfeited, and there is not even the possibility suggested in the case of United States v. Trinidad Coal Co., 137 U. S. 160, 11 Sup. Ct. 57, 34 L. Ed. 640, of an equitable claim upon the government for its subsequent repayment. The hardship of such a result, so different from that which is always enforced in suits between individuals, makes it imperative that no decree should pass against the defendants unless the wrong be clearly and fully established."

The facts in this case are no stronger in favor of the government than they were in the Budd Case; indeed, in the opinion of the court, they were not so strong. In that case Mr. Justice Brewer said, in referring to the lands purchased by Montgomery:

"It simply shows that Montgomery wanted to purchase a large body of timber lands, and did purchase them. This was perfectly legitimate, and implies or suggests no wrong. The act does not in any respect limit the dominion which the purchaser has over the land after its purchase from the government, or restrict in the slightest his power of alienation. *All that it denounces is a prior agreement—the acting for another in the purchase.* (Italics mine.) If, when the title passes from the government, no one save the purchaser has any claim upon it, or any contract or agreement for it, the act is satisfied. Montgomery might rightfully go or send into that vicinity, and make known generally, or to individuals, a willingness to buy timber land at a price in excess of that which it would cost to obtain it from the government; and any person knowing of that offer might rightfully go to the land office and make application and purchase a timber tract from the government; and the facts above stated point as naturally to such a state of affairs as to a violation of the law by definite agreement prior to any purchase from the government—point to it even more naturally, for no man is presumed to do wrong or to violate the law, and every man is presumed to know the law. And in this respect the case does not rest on presumptions, for the testimony shows that Montgomery knew the statutory limitations concerning the acqui-

sition of such lands, and the penalties attached to any previous arrangement with the patentee for their purchase."

It is clearly established that Martin and Alexander both knew the provisions of the timber and stone act. They knew that they could obtain these lands in the manner in which they were obtained without violating the law, and also with the reasonable safety of escaping any loss by reason of the loans they made. Nothing could have been more foolish than for them to violate the statute in order to get the land, when they could get it without violating the statute, and without running any considerable risk by reason of the loans. Assume, if you will, that Martin and Alexander and Copeland were all corrupt and dishonest, and willing to violate the law, if it was necessary, to get the lands, still common prudence and common sense alike would suggest that if they could get them lawfully, and at the same price that they could get them unlawfully and dishonestly, that they would pursue the former course. These lands could not be entered by anybody at less than $2.50 per acre. They could be entered for $2.50 an acre by persons who could lawfully enter them, without any agreement with the Martin-Alexander Lumber Company, just as well as they could with an agreement; and, once being entered, they could be purchased by the Martin-Alexander Lumber Company as well as any one else, and under much more favorable conditions, for the reasons already stated; and, moreover, the Martin-Alexander Lumber Company were informed by Copeland that the men with whom they were dealing were honest men, and men who would pay their debts, and therefore they assumed practically no risks. The greater number—indeed, nearly all—the men were then in their employ. The Martin-Alexander Lumber Company was running a mill there, and also a commissary store, and had open accounts with the greater number of these entrymen. They knew them themselves, and were in a measure familiar with their homes and conditions. There is no rule of law better established than where, from a given state of facts, two opposite inferences may be drawn, that inference will be adopted which is lawful and honest, and not that which is unlawful and dishonest. As stated above in the Budd Case, the Supreme Court said:

"Montgomery might rightfully go or send into that vicinity, and make known generally, or to individuals, a willingness to buy timber land at a price in excess of that which it would cost to obtain it from the government; and any person knowing of that offer might rightfully go to the land office and make application and purchase a timber tract from the government; and the facts above stated point as naturally to such a state of affairs as to a violation of the law by definite agreement prior to any purchase from the government—point to it even more naturally, for no man is presumed to do wrong or to violate the law, and every man is presumed to know the law."

That language is just as applicable to this case as it was to the Budd Case. Moreover, in the Budd Case it was shown by positive proof that Montgomery had promised at least one entryman in advance of the entry that he would pay him a bonus of $125 and all costs and expenses if he would enter a tract of land and convey it to him. No such fact is developed in this case; but the court said in that case that that fact of itself was not sufficient to show that the

land in controversy in the Budd Case had been obtained in the same way, in the face of positive testimony to the contrary. In the Budd Case neither one of the defendants appeared as a witness, nor did the notary who took the acknowledgment of Budd's deed to Montgomery, nor did White or Rockwell, the two witnesses to the application for purchase of the land. In the case at bar every person interested, except perhaps two or three of the entrymen, who could not be found, have testified positively and emphatically that every allegation of fraud in the bill of complaint is untrue.

In the case of Walker et al. v. Collins et al. (decided at the December term, 1893, by the Court of Appeals of the Eighth Circuit) 59 Fed. 70, 8 C. C. A. 1, Judge Caldwell, in delivering the opinion of the court, in discussing the character of proof required where fraud is alleged, said:

"The court charged the jury that: 'Parties to a business transaction are not presumed, however, to deal with each other in bad faith, but, on the contrary, are presumed to deal honestly and in good faith until the opposite is shown by the evidence upon the trial; and any one who alleges that such acts are done in bad faith, or for a dishonest and fraudulent purpose, takes upon himself the burden of showing that such is the case. In other words, fraud is never presumed, and it devolves upon him who alleges fraud to show the same by satisfactory proof; i. e., proof to the satisfaction of the jury.' The defendants excepted generally to this charge, and in this court limit the exception to the last clause of the charge, which states that 'it devolves upon him who alleges fraud to show the same by satisfactory proof; i. e., proof to the satisfaction of the jury.' The objection to the charge is that the court should have told the jury that fraud may be established by a preponderance of the evidence, and not that it must be established by 'satisfactory proof; i. e., proof to the satisfaction of the jury.' The charge is taken almost literally from the opinion of the Supreme Court of the United States in the case of Jones v. Simpson, 116 U. S. 609, 615, 6 Sup. Ct. 538, 541, 29 L. Ed. 742. In that case the court said, 'It devolves on him who alleges fraud to show the same by satisfactory proof.' In Hatch v. Bayley, 12 Cush. 30, the trial court instructed the jury: 'That it was necessary that the defendant should adduce stronger proof to establish fraud, etc., than is necessary to prove a debt or a sale; that the presumption was that every man conducted honestly without fraud; and when fraud was alleged the proof must not only be sufficient to establish an innocent act, but to overcome the presumption of honesty.' Considering an exception to these remarks of the trial judge, the Supreme Judicial Court of Massachusetts, speaking by Chief Justice Shaw, said: 'As we understand them, the judge intended to say that he who alleges fraud against another is bound to prove it; that every man is presumed to act honestly until the contrary is proved; that he who charges another with an act involving moral turpitude or legal delinquency must prove it; that, as this is an allegation against a presumption of fact, it requires somewhat more evidence than if no presumption existed. It carried no direction as to the amount of evidence required, or as to the nature of the evidence, whether positive or circumstantial, but only that, on the whole, it must be somewhat stronger; and we cannot perceive that such a direction is incorrect. The ordinary direction to the jury is that he who charges fraud must prove it to the satisfaction of the jury. We think it not contrary to any rule or principle of law for the judge to inform the jury that, as the charge of fraud is a charge against a presumption of fact (perhaps often a slight one), yet the jury, in order to be satisfied, might require somewhat stronger evidence than would suffice to prove the acknowledgment of an obligation, or the delivery of a chattel.' This case is cited approvingly by the Supreme Court of the United States in Jones v. Simpson, supra; and to the same effect are the following authorities: Greer v. Caldwell, 14 Ga. 207, 58 Am. Dec. 553; Bierer's Appeal, 92 Pa. 265; Babbitt v. Dotten (C. C.) 14 Fed. 19; Lynn v. Railroad Co., 60

Md. 413, 45 Am. Rep. 741; Bigelow, Frauds, pp. 123, 145; 2 Rice, Ev. p. 953; Fick v. Mulholland (Wis.) 4 N. W. 527. In Bouvier's Law Dictionary (14th Ed.) the term 'satisfactory evidence' is defined to be 'that evidence which is sufficient to produce a belief that the thing is true; in other words, it is credible evidence.' The Century Dictionary defines 'satisfactory evidence' or 'sufficient evidence' to be 'such evidence as in amount is adequate to justify the court or jury in adopting the conclusion in support of which it is adduced.' No better definition of these terms can be given, and it was in this sense, presumably, that the jury understood them."

This rule not only applies in jury cases, but it applies in courts of equity; and, moreover, it applies with increased force where the government seeks to cancel a patent which has been issued in conformity with all the prescribed rules and regulations of the department, and has undergone the supervision and inspection of the land office. Of course, it is not required that the fraud alleged shall be proven by the positive and direct testimony of witnesses. It may be proved, like any other fact, by circumstances; but the circumstances must be such as to be satisfactory to the mind of the court, and they should be circumstances that are inconsistent with the integrity and legality of the patent assailed. The facts established in this case, as a whole, are not inconsistent with the validity of the patent, or the integrity or legality of the actions of the defendants in entering the lands. Before patents which have been solemnly granted by the government shall be canceled and set aside, the facts adduced to establish the fraud should be inconsistent and irreconcilable with the integrity of the patent and the legality of the actions of the parties charged with the fraudulent entries, and should be so satisfactory as to make it clear to the court that the lands were procured by fraud. The testimony in this case falls far short of that contention. Jones v. Simpson, 116 U. S. 615, 6 Sup. Ct. 538, 29 L. Ed. 742; Colorado Coal & Iron Co. v. U. S., 123 U. S. 307, 8 Sup. Ct. 131, 31 L. Ed. 182.

On the trial of the cause the government relied strongly upon the case of Hawley v. Diller, 178 U. S. 476, 20 Sup. Ct. 986, 44 L. Ed. 1157. A careful reading of this case will disclose the fact that it is not in point. The question of a bona fide purchaser in this case is not necessarily involved, and cannot be involved unless the court should find that the entries were fraudulent. It matters not, therefore, whether the Martin-Alexander Lumber Company obtained a legal title to the property, or whether the Detroit Timber & Lumber Company acquired a legal title to the property, when the timber or lands were first purchased. They at least had the legal title when this bill was filed, because the patents had been issued, and whatever title the entrymen acquired had inured to their benefit. This is made so by the statute of the state. Sand. & H. Dig. § 699. That principle would be enforced in a court of equity even without the statute.

The bill must be dismissed for want of equity.