## In re FRIEDMAN.

(District Court, S. D. New York. May 7, 1907.)

1. BANKRUPTCY—FRAUDULENT TRANSFER.

A bankrupt shoe dealer sold his entire stock, receiving $3,850 therefor, which was given to his wife. She testified that she did not understand the matter, and did not remember whether she received any money, though early on the morning after the sale she met her brother, told him of the sale, and shortly thereafter the brother deposited with a trust company $3,070, which he testified was obtained from his brother-in-law, W., in repayment of certain loans which neither were able to identify. Thereafter the wife's brother, on being served with a subpœna in bankruptcy for his examination, called on W., and gave him a check for $2,500 without solicitation, which check was immediately certified and paid. *Held*, that the transaction was a scheme to defraud the bankrupt's creditors, and that the fund would be ordered paid over to the trustee.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bankruptcy, § 274.]

2. SAME—SUMMARY PROCEEDINGS.

Where the proceeds of a sale of a bankrupt's business were found to be in possession of certain persons, who were a mere cover or receptacle for the property to conceal it and prevent it being reached by the bankrupt's creditors, it was recoverable by summary proceedings; the trustee not being required to resort to a plenary suit for that purpose.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bankruptcy, § 447.]

On the night of March 17, 1907, the bankrupt, a shoe dealer, sold his entire stock, receiving therefor $3,850, which, it was alleged, was given to his wife, C. The latter testified she was suddenly called to the store, where she saw several strangers, but was so excited she was unable to understand what was transpiring, and she could not remember whether she received any money. Early the next morning she met her brother, L.—a Coney Island photographer, in a small way of business—at the Manhattan entrance of Brooklyn Bridge, by accident, as she testified; told him of the sale, and that her husband had gone away; whereupon L. returned to Coney Island to search for the bankrupt, and C. returned home. A notary public, who drew the bill of sale, testified that C. received the money. On March 19th, L. deposited in cash in a trust company at Coney Island the sum of $3,070, which he testified was obtained from W., his brother-in-law, in repayment of loans made at various times several years past, though the exact dates of such loans were unknown, as he kept no record, and that they were made in cash, although L. kept a bank account.

W. testified that he borrowed said moneys, but, however, could give no details, as he kept no record thereof, and further stated that he repaid the full amount in cash to L. ôn March 19th. On March 26th, after being served with a subpœna in bankruptcy for his examination, L. called on W., and gave him $2,500 by check, which L. testified he did not need and was willing to loan to W. again, though the latter had not requested such loan. The check was immediately certified, and W. received the cash.

Lesser Bros. (William Lesser, of counsel), for the motion.
Steuer & Hoffman (Max D. Steuer, of counsel), opposed.

HOUGH, District Judge (after stating the facts). The story of Celia Friedman is inherently preposterous, as well as demonstrably false. I am convinced that she received (contemporaneously with the sale) $3,850, and has since acted as the confederate of her hiding husband. Considering the relationship between Mrs. Friedman and Levinson, and the connection by marriage with Wiltchick, I am convinced that the three have been acting in concert to protect the proceeds of the Friedman fraud from creditors. The $3,070 deposited by Max Levinson in the Jenkins Trust Company he received from Mrs. Friedman. His tale of hidden affluence and sudden payments of moneys long lent without security is ridiculous. Wiltchick, as a man of substance, has been used as a convenient depository for moneys he could be relied upon not to steal from those who wrongfully intrusted the same to him, and he has now by his own statements $2,500 handed him by Levinson.

The order may pass against Wiltchick, requiring him to pay over $2,500; but he, if he prefers, may give bond in double that amount, with sureties to be approved, for the payment of $2,500, on demand to the trustee when appointed or elected.

A summary order for $570 may pass against Levinson, and a summary order for $780 against Celia Friedman.

No summary order will be made against the Jenkins Trust Company; but that company may be enjoined from permitting the account of Max Levinson with them to be reduced below $570, except by check drawn by Levinson, certified by the trust company and payable to the order of the temporary receiver herein.

On Application for Reargument of Motion against Celia Friedman, Max Levinson, and Samuel Wiltchick, to Compel Them to Turn Over Certain Moneys, and also on Application to Punish the Parties Above Named for Contempt in Failing to Turn Over.

The brief on the application for reargument is an able presentation of one side of a question that in my experience has never been more clearly presented than in this case. It may be admitted that the District Court on the bankruptcy side has no power summarily to try a question of title, if any real question of title exists. It may also be admitted that the same court has no power summarily to order the appropriation by a receiver or a trustee of property obtained from the bankrupt either by fraud upon him or in pursuance of his intent to hinder, delay or defraud his creditors, if any property was so obtained. But if property which had once been in the possession of the bankrupt is

found in the possession of any person, and such person is, in the opinion of the court, very clearly but a cover or receptacle for that property which as between the bankrupt and such other person is still the property of the bankrupt, or if (to vary the simile) the person who holds property which was formerly in the possession of the bankrupt is but the alter ego of the bankrupt, then a summary order is proper, and no pretended instruments of transfer, no apparatus of conveyances, should prevail. The question is: Whose is the property? And if, according to the evidence, it be the property of the bankrupt, the bankruptcy court should order its restoration to the representative of the creditors and enforce that order by the most drastic means. If this be not done, creditors in most cases are utterly without remedy, for a plenary suit against persons who are in truth but receivers of stolen goods (or money) is but an expensive illusion.

In this case an unusually complicated scheme was pursued to hide the proceeds of the sale of the bankrupt stock. The complication of the method only renders more necessary the application of the rule which, I believe, exists.

The application for reargument is denied.

The opposition to the punishment of the persons proceeded against for contempt is really based upon a proposition perfectly sound in itself, but, I think, inapplicable to the matter in hand. A person who has no money should not be punished for contempt in failing to turn over money. But the very point of this proceeding is that it is the opinion of the court that the persons proceeded against have the money and do not tell the truth when they assert their inability to pay. Instances are numerous where this same objection was made in limine, and the court became satisfied in time, either that the parties incarcerated had spent the money, or intrusted it to still other persons who had made away with it, and thereupon the prisoners were released. But if any person into whose possession money is traced can avoid the legitimate consequence of the possession of that money by swearing that he no longer has it, or never had it, the administration of justice would become a farce.

The orders to turn over having been duly served, and the time limited for payment having expired, the persons proceeded against are adjudged to be in contempt, and the usual order will be made.