### In re HOLLAND.

(District Court, E. D. New York. February 11, 1910.)

BANKRUPTCY (§ 288*)—CONCEALMENT OF ASSETS—CONTEMPT.

Where a bankrupt disposed of considerable property, and with the proceeds paid certain debts and turned over the balance to his son, who, on an order of the bankruptcy court to turn over the money unaccounted for to the trustee, claiming that he was unable to comply with the order, testified that he had paid board to his mother, and that he was gambling on horse races or interested in bookmaking individually and as a partner with another, but his testimony as to when and where there were race meets at which they could carry on the business of bookmaking was inconsistent with the dates when the money came into his hands, and where the son made no claim of title, the son will be committed until he has purged himself of contempt or is released by further order.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 288.*]

In the matter of Kolman Holland, bankrupt. Contempt proceedings against Harry Holland for failure to comply with order of court to turn over funds to trustee.

Brewster & Farries, for trustee.

Law & Holtzmann, for Harry Holland.

CHATFIELD, District Judge. The bankrupt secured certain moneys and paid off therewith some antecedent debts, from the sale of a milk business and mortgages placed upon his real estate, between the 26th day of July and the 10th day of August, 1909. He also received in cash, over and above these debts, the sum of $2,603 during the same period. This amount of money was actually in the possession of his son, Harry Holland, as agent for the bankrupt.

Upon reference to a special commissioner it was found that certain further expenditures and payment of indebtedness, amounting to $1,-295.66, by the bankrupt and by his son, Harry Holland, were proven; but the balance, $1,307.34, was not satisfactorily accounted for.

The son is shown to have had in his hands all of the money received from his father's property, and whatever was not expended by him, or returned to the father and paid out by the father, is, so far as the bankrupt is concerned, still in the hands of the son or chargeable against him as a debt of the estate.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Upon an application to direct the bankrupt and his son to turn over the money unaccounted for, as reported by the special commissioner, this court decided that, inasmuch as the testimony made out an apparent case of embezzlement or fraud on the part of the son as against the father (for the money which had been neither returned to the father nor expended on his behalf), no order could be made directing the father to pay this balance to the receiver or trustee in bankruptcy, as it was not shown that there was anything in his possession or control. Especially was this so as Harry Holland, the son, was a party to the motion, and had submitted himself to the jurisdiction of this court, admitting his liability for whatever balance of his father's property might be due from him, and making no claim of title in himself with respect thereto.

Considerable testimony has been taken, which Harry Holland, the son, contends establishes his inability to comply with the order of the court, and on which he asks to be relieved from any punishment, at least for apparent contempt of the order under which he was directed to pay over to the bankrupt estate the amounts for which he had failed to account, or which he admitted his indebtedness for to the estate.

It is apparent that Harry Holland is now working on a small salary, and has no property, disclosed by the examination, which could be applied to this purpose. His explanation of what had been done with the money in question is confined to a statement that he paid board to his mother (which she has not substantiated), and that he was gambling upon the horse races or interested in the occupation of bookmaking, both individually and as a partner with one Rogoff.

His testimony and that of Rogoff, as to when there were race meets at which they could carry on the business of bookmaking, is to a great extent inconsistent with the dates when this money came into the hands of Harry Holland. The transactions on the part of both the bankrupt and his son are extremely peculiar, and do not impress one with the idea that they were attempting to be honest with their creditors. But the father has evaded responsibility by accusing his son of what is substantially a crime, and the son does not deny the transaction, but merely pleads acquiescence or condonation on the part of his father.

It is apparent that a trustee in bankruptcy could, under these circumstances, obtain a judgment against Harry Holland, and the order directing him to turn over the property belonging to his father's estate was no more than the estate was entitled to from both the father and the son.

But the son, Harry Holland, contends that he should not be imprisoned for contempt of this court's order, inasmuch as he has shown (according to the arguments presented in his behalf) inability to obey the order, coupled with no disrespect or willful disobedience thereof; and he also suggests that, under the charge of contempt, he should not be punished for acts which, even if wrong in themselves, were committed before the order in question was made, and which were not in any way anticipatory thereof.

The creditors have called the attention of the court to Matter of Friedman (D. C.) 18 Am. Bankr. Rep. 712, 153 Fed. 939, in which the

176 F.—40

bankrupt and his wife and a third party were each ordered summarily to turn over certain amounts traced into their hands, and for which they did not furnish a satisfactory explanation. This case was affirmed by the Circuit Court of Appeals. 161 Fed. 260, 88 C. C. A. 306.

In Matter of Frankfort (D. C.) 15 Am. Bankr. Rep. 210,[1] decided in this district, the bankrupt was imprisoned upon a writ of ne exeat, in default of bail pending the payment by him of a sum of money which it was claimed had been stolen from his wife under circumstances from which the court found that the money was still in her possession or control.

In Matter of Weinreb, 16 Am. Bankr. Rep. 702, 146 Fed. 243, 76 C. C. A. 609, the bankrupts were directed to pay over to the trustee money which they claimed to have expended in ways that the court was satisfied were false; and in general the decisions in these cases are based upon the reasoning in the Friedman Case, supra, in which the court said:

"But if property which had once been in the possession of the bankrupt is found in the possession of any person, and such person is, in the opinion of the court, very clearly but a cover or receptacle for that property which as between the bankrupt and such other person is still the property of the bankrupt," a summary order is proper.

Again:

"And if, according to the evidence, it be the property of the bankrupt, the bankruptcy court should order its restoration to the representative of the creditors and enforce that order by the most drastic means. If this be not done, creditors in most cases are utterly without remedy, for a plenary suit against persons who are in truth but receivers of stolen goods (or money) is but an expensive illusion.

"A person who has no money should not be punished for contempt in failing to turn over money. But the very point of this proceeding is that it is the opinion of the court that the persons proceeded against have the money and do not tell the truth when they assert their inability to pay."

And further:

"If any person into whose possession money is traced can avoid the legitimate consequences of the possession of that money by swearing that he no longer has it, or never had it, the administration of justice would become a farce."

There can be no doubt as to the conclusions of the court in these cases that fraud or perjury will prevent the creditors in bankruptcy proceedings from obtaining the property which should be applied to the payment of their debts, and certain drastic methods are the only means applicable to such a situation. But the more serious question is whether the contempt of court has been willful, and whether there is ability to repay, because, in the absence of either of these elements, an order directing punishment for contempt, by compelling the payment of indebtedness through the compulsion of imprisonment (it being apparent that, if the person in contempt is unable to pay, the money to release him must be raised by other people), would be perilously close to imprisonment for debt or crime, and no authority for that method of collection can be found under the laws of the United States.

The situation is much similar to that existing in proceedings supplementary to execution upon a judgment in a court of law, where authority is given by statute to impose a fine equal to the amount of the execution, with costs, and to imprison the party in contempt until the fine is paid. Such a penalty has never been held imprisonment for debt, and is especially applicable where the party alleged to have property of the judgment debtor hides behind an unbelievable story as to the circumstances under which he and the judgment debtor created the relations that existed between them for the palpable purpose of defrauding the debtor's creditors. So in the case at bar, the story told by the bankrupt as to the purposes for which he borrowed the money in question, and by Harry Holland as to his reasons for taking the balance of these loans and sales out of the funds of his father's business, and using them to a large extent to gamble at the race track, is worthy of no belief whatever. If the bankrupt intrusted his son with what he could save from the wreck of his business, and the son paid back to the bankrupt one-third, which with several hundred more was used preferentially to pay debts and for ordinary household expenditures, and then lost the balance by gambling at the race track, both the son and the father have shown such lack of moral capacity and disregard of creditors' rights that their statements should not be given any credence whatever. The testimony, however, as to the expenditures at the race track, is unsatisfactory, except to the extent of suggesting that such a man would probably have no compunction about gambling in one form or another, and the story bears no indications of truth beyond that point.

Under the demands of the creditors and the orders of the court, neither the bankrupt nor his son have endeavored to restore or secure anything for the remaining creditors of the estate; and the so-called "bookmaker," who testified that Harry Holland had advanced money to him for the purpose of making books, but who could not give any satisfactory statement of how much he had received in that way, nor when it had been received, does not seem to object to being shown to have received money apparently stolen from other people.

Under such circumstances, the respondent, Harry Holland, should be punished for his defiance and disregard of the order of the court, by which he was directed to restore the property which he admitted should be paid by him to the estate, and which this court is satisfied he either had within his control, or could, in part at least, reobtain if he had made honest efforts so to do.

He will be committed until he has purged himself of contempt or is released by further order.