## HENKIN v. FOUSEK.

(Circuit Court of Appeals, Eighth Circuit. October 15, 1917.)

No. 186.

1. BANKRUPTCY ☞136(2)—PROCEEDING TO COMPEL SURRENDER OF PROPERTY—ISSUES AND PROOF.

On a petition by a trustee to require a bankrupt to turn over money or property, the issue is whether he has such money or property belonging to his estate in his possession or under his control, on which issue the burden of proof is on the petitioner to establish such fact by a preponderance of the evidence, and, while evidence tending to show that the bankrupt fraudulently contracted the debts scheduled may be pertinent as affecting his credibility and the weight to be given to his testimony, that question is beside the issue, and the petitioner is not required to prove the fraud, even though alleged in the petition.

2. BANKRUPTCY ☞440—APPELLATE PROCEEDINGS—MODE OF REVIEW.

In bankruptcy proceedings, the remedies for review by appeal and petition to revise are mutually exclusive.

3. BANKRUPTCY ☞439—ORDER OF SURRENDER OF PROPERTY—MODE OF REVIEW.

An order requiring a bankrupt to turn over money or property to his trustee is reviewable by petition to revise, upon which only questions of law can be considered.

4. BANKRUPTCY ☞446—APPELLATE PROCEEDINGS—PETITION TO REVISE.

Where the only requisite raised on a petition to revise an order requiring a bankrupt to turn over money or property to his trustee is whether the order is sustained by the evidence and there is evidence to support it, there is no question of law which can be considered by the appellate court.

Petition to Revise Order of the District Court of the United States for the District of South Dakota; James D. Elliott, Judge.

In the matter of Louis Henkin, bankrupt; Charles B. Fousek, trustee. Petition by the bankrupt to revise an order of the District Court. Petition dismissed.

Elton W. Stanley, of Sioux Falls, S. D., for petitioner.

Herbert Abbott, of Sioux Falls, S. D. (Cherry & Abbott, of Sioux Falls, S. D., on the brief), for respondent.

Before HOOK, SMITH, and STONE, Circuit Judges.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

SMITH, Circuit Judge. The petitioner, Louis Henkin, was about January 26, 1916, upon his voluntary petition adjudged a bankrupt by the United States District Court for South Dakota, and on February 14th the respondent Charles B. Fousek was appointed trustee of the estate. The bankrupt's schedules showed he had liabilities to the amount of $7,007.50 and no assets except $50 in cash, a traveling bag $10, wearing apparel $50, and a watch and cuff links $45, total $155, substantially all exempt. On March 18, 1916, the trustee filed before Hon. Henry A. Muller, special referee, a petition in which he alleged that the bankrupt's debts were all contracted on or about the 26th day of April, 1915, for eggs bought by him from his creditors; that he received and sold said eggs for his own benefit and obtained therefor the sum of more than $6,000 with the intent and purpose of defrauding the persons who sold him the eggs; that he obtained considerable amounts of money from the resale of the eggs which he has ever since and still secretes and keeps in hiding from his said creditors and this trustee. The trustee asked an order that Louis Henkin turn over to him the said sum or show cause for his failure to do so, and that upon his failure to make a showing he be attached for contempt. The special referee on April 3, 1916, issued an order to show cause. April 20, 1916, the bankrupt filed his answer in which he denied the fraudulent purpose and the secretion, concealment, and the wrongful withholding of assets. Further answering, he said:

"That he has been engaged as a dealer in produce for the five years preceding his adjudication, and that on or about April 4, 1915, he entered into a contract with the Cudahy Packing Company of Chicago, through their branch office in Sioux City, Iowa, under which contract he was to deliver to that company at Sioux City 1,000 cases of eggs each week for a period of approximately six weeks, at certain prices as determined by the Chicago market, with deliveries to be made weekly. By certain oral agreements, this written contract was somewhat altered as to the methods of purchases, deliveries, etc., and the bankrupt proceeded to fulfill it according to its terms, operating from his office at Elk Point, S. D.

"Notwithstanding unfavorable conditions during the first and middle parts of April, he delivered about 250 cases weekly to the said company, though realizing no profits thereon. Later, however, on or about April 26, 1915, he ordered approximately 2,500 cases of eggs on account of what he believed to be a favorable market, which would thus enable him, as he thought, to advantageously fulfill his contract with the Cudahy Packing Company. According to his custom, he used the Chicago market of Saturday (April 24th) as his purchasing price on Monday (April 26th). The Chicago market slumped 25 cents a case on Monday, shortly after he had sent out his bids, with the result that all of those to whom the bids were made took advantage of the same and unloaded onto the bankrupt the entire 2,500 cases. All of these various shipments of that date were immediately sold to the Cudahy Packing Company; but the latter, contrary to its custom, paid the bankrupt at the rate of the Chicago quotations of Monday instead of the Saturday quotations, thus making the bankrupt's absolute loss in the transaction 25 cents a case, or about $625. Immediately upon his learning of the acts of the company, he informed them that he would not fulfill the contract if its terms were to be thus construed to the advantage of the company at its own option, whereupon that company entirely held back payment for approximately $400 worth of eggs, thus causing the bankrupt a loss and shortage in operating funds, to the amount of over $1,000 at the end of the week, on or about May 1st.

"The bankrupt further says that, according to his information and belief, all of these 2,500 cases would not have been shipped had it not been for the

slump, for he had previously been advised to order that many, more or less, to insure his getting the 250 cases a week above mentioned. For the larger portion of these 2,500 cases of eggs the bankrupt became indebted to certain of his present creditors to the amount of $6,864.20, as set forth in schedule A-3 of his original petition, for which, at the time of the purchase, his intention was to remit promptly, in the due course of business.

"The bankrupt remitted to the extent of about $6,000 to certain of the shippers following the purchases of April 26th, before he realized his losses, whereupon he sought the advice of one Solem, an agent of the Cudahy Packing Company at Sioux City, and of his lawyer, Mr. A. L. Fribourg, also of Sioux City. The loss was due, according to the bankrupt's information and belief, to the unjust and unfair interpretation of the contract by the said company, to the fluctuations of the market, and to other conditions affecting the conduct of such business over which the bankrupt had no control. Solem advised him to go to Chicago and interview the head office with a view of settling the dispute and canceling the contract, and, if unable to do so, to remain in Chicago during the balance of the egg season, where he could operate to much greater advantage, due to the many competitive markets, and due to his immediate presence at the egg exchange at the time of any fluctuations in price that might occur. His lawyer advised him to temporarily postpone making payments to the balance of his creditors, pending an adjustment of his affairs with the Cudahy Packing Company.

"Acting on the advice of these parties, he shortly thereafter, on or about May 3, 1915, left Elk Point for Chicago, taking with him about $300 in cash and $6,000 in the shape of three drafts each for $2,000, most of which represented the proceeds from the sale of the eggs. His intention was, first, to try and cancel his unfavorable contract with the Cudahy Packing Company, and, if unsuccessful in that, to remain in Chicago temporarily for the reasons above stated, and thus, if possible, to carry on his trading in eggs at a financial gain instead of at a loss, and thereby redeem his previous losses on the eggs purchased on or about April 26th, from his present creditors, pay them up in full, and continue to purchase eggs from them in the regular course of business.

"On arriving in Chicago on May 4, 1915, the bankrupt was informed by the Cudahy Packing Company that he would be held strictly to the terms of his contract, which forced him to choose the other alternative of remaining in Chicago temporarily for the reasons above stated. On that same day, while at the egg exchange, the bankrupt made the acquaintance of a stranger, whose true name is unknown to the bankrupt, but according to the best of his information and belief the stranger's name was Hawkins. This man introduced himself to the bankrupt, saying that they had previously met at a convention in Des Moines, Iowa. After going to the theater that evening, the bankrupt was met at the Sherman Hotel (where the bankrupt had registered) by the aforesaid stranger, and they proceeded to visit numerous cafés and saloons, freely indulging in the use of intoxicating liquors, until a late hour, after which they went to the bankrupt's room in the said hotel, and began to gamble, using cards as the medium and stud poker as the style. Winning heavily at first to the extent of about $200, the bankrupt attempted to win back the losses he had sustained from the unfortunate turn of the affairs of his egg business, and with this in mind he proceeded to plunge, but at daylight he was the loser of approximately $250, which comprised nearly all of the money he carried on his person.

"Stunned by his large losses, which, including the $400 held up by the company (the bankrupt believing this $400 to also have been a total loss to him), amounted to about $1,275, the bankrupt on the day following cashed one of the drafts for $2,000 at a local bank and resumed play that night with his new-found friend in a desperate effort to recoup from his previous losses. Under this impulse, the bankrupt continued to gamble for the balance of the week, losing rapidly and heavily in his vain attempt to put himself back on a sound financial footing. The night of May 5th, he lost practically the entire proceeds of the $2,000 draft he had cashed that day. The following day, May 6th, he cashed the other two drafts, losing over $1,000 that night, and on the

night of May 7th he lost the balance, thus bringing his total loss in business and gambling up to a total of approximately $6,000, which is the money the trustee now declares the bankrupt has in his possession or control. All of the said games of poker took place in the rooms of the bankrupt at the Sherman Hotel, which were, to the best of his knowledge and belief, first room 307 and later room 205. No other parties were present, and, to the best of the bankrupt's information and belief, the games were played without the knowledge of any other person, with the exception of a bell boy, who on one occasion served drinks to them, and to whom the bankrupt gave a tip of 25 cents in consideration of the bell boy keeping his silence because of the rules of the hotel against gambling. The bankrupt further says that the said games were played without chips, paper money of the larger denominations being the medium of exchange; that each night's session of gambling was preceded by visiting the various cafés and saloons until after the hour of midnight, which resulted in the bankrupt's nightly becoming intoxicated; that to the best of the bankrupt's knowledge and belief he was drunk and under the influence of liquor at and during most of the time the gambling was in progress; that the above-mentioned Hawkins, if that be his true name, was and is, according to the bankrupt's belief, a professional gambler, who took advantage of the bankrupt's condition and relieved him of all his earthly possessions.

"After thus losing all of his money with the exception of about $200 to the said stranger, the latter disappeared, and the bankrupt was unable to trace him after repeated efforts to do so, and since that time the bankrupt has never seen nor heard from the said stranger, nor does the bankrupt know where the said party can be found.

"For the week following this experience, the bankrupt says that he remained in Chicago under the doctor's care, suffering a breakdown on Sunday, May 9th. Broken down mentally and physically from the excessive use of intoxicants within the period aforesaid, from May 4th to May 8th, and due to the anguish and suffering over his stupendous losses in business and gambling, he continued to be under the doctor's care, taking treatment for a period of at least two months.

"Shortly after returning to Elk Point, the bankrupt, as soon as he was physically able to do so, took up the matter of bringing suit against the Cudahy Packing Company on the aforementioned contract and the amendments thereof made orally and by correspondence. Such suit was started by his Sioux City attorney on or about May 24, 1915, for $10,000 damages; but, due to the general legal advantages having been obtained by the company, the suit was dropped by the bankrupt on the advice of his counsel. Later in September, the company made a remittance of a small amount in settlement for the eggs, which had been held up, as previously stated.

"The bankrupt further says that he was solvent at the time he became indebted to his present creditors; that he acted in good faith and intended to pay them in full for the eggs according to the agreement; that not until the month of January, 1916, did he contemplate bankruptcy to relieve himself of his hopeless state of insolvency, which was more than eight months after the shipment of eggs to him by certain of his present creditors.

"In this bankruptcy proceeding the bankrupt says that he has testified truthfully and to the best of his knowledge and belief; that he has concealed no assets from the trustee; that the schedule filed with his petition properly represents all of his assets existing at the time thereof; that since the filing of the said schedule he has not come into possession of the funds mentioned in the petition of the trustee.

"Therefore, as to the delivering of the $6,000 as prayed for in the petition of the trustee, the bankrupt says that it is physically impossible for him to so deliver the same for the reasons herein stated, and because in truth and in fact he has it neither in his possession or control, nor is he able to obtain possession or control of the same."

The case was heard before the referee on March 8, April 25, and May 15, 1916. On July 25, 1916, the referee found that the bankrupt

still had in his possession the $6,000 in question, and on September 16th formally ordered him to turn it over to the trustee. September 20, 1916, the bankrupt filed a petition for review, and on February 20, 1917, the District Court sustained the order of the referee. Thereupon the bankrupt filed his petition to revise such ruling in this court.

The argument has taken a wide scope, but many of the questions discussed need not be determined in this case. There has been much discussion of what amount of proof is necessary in cases of this character. If this were a criminal contempt case, it would clearly be necessary for the prosecution to make a case beyond a reasonable doubt. Gompers v. Bucks Stove & Range Co., 221 U. S. 418, 444, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; Merchants' S. & G. Co. v. Board of Trade of Chicago, 120 C. C. A. 582, 201 Fed. 20, 27.

But even if this order should be followed by a contempt proceeding, it would be a "civil contempt" as distinguished from a "criminal" one. Freed v. Central Trust Co. of Illinois, 132 C. C. A. 7, 215 Fed. 873.

It is doubtful whether in civil contempt proceedings it is necessary to prove the contempt case beyond all reasonable doubt. The Supreme Court of the United States expressly declined to pass upon that question in Gompers v. Bucks Stove & Range Co., 221 U. S. 418, 444, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874. But this is not a contempt case at all, but is a civil proceeding to obtain an order to turn over property alleged to be in defendant's possession. It is true it is alleged the bankrupt acquired the property with intent to defraud his creditors, and if it was necessary to prove the fraudulent purpose it would be necessary to show that fact by satisfactory evidence. Jones v. Simpson, 116 U. S. 609, 6 Sup. Ct. 538, 29 L. Ed 742; Walker v. Collins, 8 C. C. A. 1, 59 Fed. 70; United States v. Detroit Timber & Lumber Co. (C. C.) 124 Fed. 393; Arnold v. Horrigan, 151 C. C. A. 115, 238 Fed. 39, 46.

And in Re Hawks (D. C.) 204 Fed. 309, 316, it is said that to warrant a finding of fraud the evidence must be of such nature as to be convincing and inconsistent with a presumption of honesty, and this court in Schweer v. Brown, 64 C. C. A. 574, 130 Fed. 328, said that in cases of fraud the evidence must be clear and convincing. It has been held that an action to set aside a patent or deed upon the ground of fraud can only be sustained upon a showing of the fraud by evidence clear, unequivocal, and convincing. Maxwell Land Grant Case, 121 U. S. 325, 381, 7 Sup. Ct. 1015, 30 L. Ed. 949; United States v. San Jacinto Tin Co., 125 U. S. 273, 299, 8 Sup. Ct. 850, 31 L. Ed. 747; United States v. Mills (C. C.) 169 Fed. 686.

[1] The question in this case at once arises: Was it necessary for the trustee to prove the alleged fraud? That the $6,000 in question was once the property of the bankrupt is beyond question; that, if he still had it at the time he was adjudged a bankrupt, he was bound to turn it over, is likewise beyond dispute. The question of whether he contracted the debts scheduled in bankruptcy with intent to defraud his creditors throws an interesting sidelight upon the case, but not more.

There has been a conflict in the authorities from an early time as to whether, in view of the fact that such orders as this may be enforced by process of contempt, the rule as to the evidence required in a criminal contempt case applies. This turns largely upon the question of whether the court in the contempt case can investigate the question of the ability of the bankrupt to pay over money or turn over property, or is conclusively bound by the former adjudication. A most interesting list of the authorities on both sides of this question down to that time will be found in Re Haring (D. C.) 193 Fed. 168.

In Schweer v. Brown, 64 C. C. A. 574, 130 Fed. 328, this court in a case that had proceeded to an order of commitment declined to pass upon the question of the quantum of proof required, upon the ground that it appeared that appellant had the property there in question in his possession beyond all reasonable doubt. It must be remembered that that was an appeal, while this is on petition to revise in matter of law. In re Cole, 75 C. C. A. 330, 144 Fed. 392; Id., 90 C. C. A. 50, 163 Fed. 180, 23 L. R. A. (N. S.) 255.

[2] It is now the settled law of this circuit that the remedies by appeal and petition to revise are mutually exclusive. Century Savings Bank v. Moody, 126 C. C. A. 499, 209 Fed. 775.

[3] And it has been held that the only method of reviewing an order on the bankrupt to turn over money or property to his trustee is by petition to revise, and not by appeal. Kirsner v. Taliaferro, 120 C. C. A. 305, 202 Fed. 51; In re Mertens, 73 C. C. A. 561, 142 Fed. 445; In re Shidlovsky, 140 C. C. A. 654, 224 Fed. 450; Fisher v. Cushman, 43 C. C. A. 381, 103 Fed. 860, 51 L. R. A. 292; Lazarus v. Harding, 138 C. C. A. 414, 223 Fed. 50.

This case was brought to this court by the proper proceeding, but it does not follow that under it all the questions can be raised in this court which could have been raised if the remedy had been by appeal.

The Bankrupt Act, 30 Stats. 553, § 24, subd. b, U. S. Compiled Statutes 1916, p. 11346, § 9608, provides:

"The several Circuit Courts of Appeal shall have jurisdiction in equity, either interlocutory or final, to superintend and revise in matter of law the proceedings of the several inferior courts of bankruptcy within their jurisdiction."

There is no question of law presented on this petition except that the petitioner claims there is no conflict in the evidence and that it appears he did not have the money in his possession or control at the time the order was made.

It will be conceded that it must appear that the money was in the hands of the defendant at the time of the order. In re Rosser, 41 C. C. A. 497, 101 Fed. 562; Samel v. Dodd, 73 C. C. A. 254, 142 Fed. 68; Stuart v. Reynolds, 123 C. C. A. 13, 204 Fed. 709. But that only questions of law can be considered. Good v. Kane, 128 C. C. A. 454, 211 Fed. 956; In re Rosser, 41 C. C. A. 497, 101 Fed. 562; In re Purvine, 37 C. C. A. 446, 96 Fed. 192.

[4] It is conceded that the bankrupt had about $6,300 in his possession early in May, 1915, between eight and nine months before his petition in bankruptcy. His only excuse is that he lost substantially

all of this in a poker game in Chicago. The referee and the District Court found that he had so lost none of it. This is not a case where he claimed to have spent the money for living or other charges or lost it in business. Upon the undisputed evidence he still has the money, unless he lost it in the poker game in question. Is there any conflict in the evidence on that subject, or is there such conflict in the bankrupt's testimony as to wholly discredit him?

He alleges in the schedule filed at the commencement of the bankruptcy proceedings that all his debts on open accounts were contracted on or about Monday, April 26, 1915. He complains that eggs were unloaded upon him because he agreed to pay 25 cents a case more than was warranted by the Chicago market. How his customers were to know that the price he was paying was too much, when he did not know, is not explained. The result is he claims a loss of $625. These eggs were bought on Monday, April 26th, and shipped to Sioux City, and he collected the $6,000 on them within a week. On Monday, May 3d, just a week after he bought these eggs of the persons who sold them to him, he had shipped them to Sioux City, collected the money on them, deposited it in the First National Bank at Elk Point, S. D., and secured from it three drafts on the Continental & Commercial National Bank of Chicago for $2,000 each. This was quite rapid action.

Considerable complaint is made that the Cudahy Packing Company only allowed him for the price of Monday, April 26th, instead of the price of Saturday, April 24th, two days before he bought the eggs. The contract with the Cudahy Packing Company was made orally with Mr. Solem on Saturday April 3, 1915, and was confirmed by a letter from Chicago on April 6th, by the Cudahy Packing Company by Maurice Manderville.

Subsequently to his return from Chicago, he brought suit against the Cudahy Packing Company for $10,000 damages under this contract, but dismissed it upon his own motion. He used it, however, while pending as the basis for excuses to his creditors. He agreed to remit to his creditors upon receipt of the goods, but he got the goods, shipped them to Sioux City, got the money on them, and never paid for them. There is nothing to indicate he had any cause for complaint in his transactions with the Cudahy Packing Company. He deemed it necessary to explain how he came to take this $6,000 to Chicago, and says he went down to get a cancellation of his contract with the Cudahy Packing Company (of course, he had no need for this $6,000 for that purpose), and, in case he failed to secure such cancellation, to go to buying eggs upon the market to carry out his contract. His contract was to deliver at Sioux City. The Cudahy Packing Company, having a contract with the bankrupt to buy eggs and deliver them at Sioux City "bought in your territory," it is manifest they were not bound to take eggs bought at Chicago at the very least unless delivered at Sioux City. If they would not cancel the contract, it is improbable that they would make a new contract by which he could buy in Chicago, where they doubtless had agents. The alleged scheme to buy in Chicago to perform a contract to deliver eggs "bought in your territory" is at least chimerical, yet this is the only explanation he gave of having the

money at Chicago at all. This money was derived from the very eggs he delivered to the Cudahy Packing Company.

The bankrupt testified he wired his brother, Dr. John Henkin, to meet him at the train, and he did so. Dr. Henkin swears he did not see the bankrupt at the train, did not see him until Friday, the 7th of May, after the bankrupt claims to have lost all the money. The bankrupt was unknown at the Chicago banks. He went to the drawee bank, the Continental & Commercial National Bank on Wednesday, May 5th, but they refused to cash these drafts until he was identified. He then went to Morris Tower, who was well acquainted with the father of the bankrupt, and Tower went with Henkin to the bank where Tower did business, the National Bank of the Republic, and identified him to that bank, and it guaranteed the indorsement of Henkin. Tower swears that Dr. John Henkin was along, as does Oscar H. Swan, now cashier of the bank. This is in direct conflict with the testimony of both the Henkins. The bankrupt thus cashed one of the drafts at the drawee bank. This, it will be remembered, was on Wednesday, May 5th. On the following Thursday, May 6th, the bankrupt cashed the other two drafts at the National Bank of the Republic. Mr. Swan, now cashier of the bank which guaranteed the indorsement on May 5th and paid the two drafts on May 6th, testifies that when he came with Mr. Tower on May 5th he did not observe anything indicating that the bankrupt had been up all night or drinking the night before, and when he came the next day there was absolutely nothing about him that indicated to him that he was carrying on a course of dissipation or excessive drinking. The bankrupt went direct to the Sherman Hotel. After his return home, he was sued by some of his creditors and judgment obtained. One of these, Eno, instituted proceedings auxiliary to execution, and the bankrupt was examined as a witness and testified that he occupied two rooms at the Sherman, 307 and 205, and "I think we played in 307." He was in fact registered in 411, and there is nothing to indicate he ever occupied any other room. This is mentioned, not as important in itself, but because he noticed and remembered the number of a bellman, who called at his room to take an order for two bottles of beer and two sandwiches, as No. 9. While a man is not expected to remember the numbers of all the rooms he occupies, he might remember whether he moved from one floor to another on the same trip, but much less would he remember the number of a bellboy who called at his room to take an order for two bottles of beer and some sandwiches, unless at the time he expected to call the boy as a witness, and this theory is corroborated in this case by the fact that he called the attention of the boy to a deck of cards and some money on the table, and said they were having a game, and gave him 25 cents as a tip. There was no one else in the room at the time but the defendant and the bellboy, but the latter saw some one in the bathroom. This entire scene is wholly consistent with the theory that it was a plan to make evidence when this lawsuit or a similar one arose, and seems inconsistent with any other theory, as it was unreasonable that the bankrupt should remember the number of the bellboy unless it was for the purpose of calling him as a witness, and still more unreasonable that he called to

the attention of the bellboy the fact that a game was going on, although they had no chips, and the money could have been pushed inside a drawer as well as the other party could be sent to the bathroom.

After the bankrupt gave the checks to the First National Bank of Elk Point for the three drafts in question, he had a balance of only $17.96, but he took with him to Chicago besides the drafts about $300 in money. The bankrupt reached Chicago at 8:30 a. m. Tuesday, May 4th. He claims he went to the Sherman Hotel, registered, got shaved, and went to the office of the Cudahy Packing Company.

"It was in the morning, and I got away from there (Cudahy Packing Company), so it must have been before dinner. I did not go back there in the afternoon. At the Cudahy Packing Plant, I met Mr. Manderville in the office.

"Q. Who else did you meet with. Was there a stranger there? A. I can't tell you his name. I don't remember. I think his name is nearly mine. I think it is Hawkins. I am not sure; I met him in the entrance. I was going up, and he recognized me. I am pretty sure that he did recognize me. This was in the forenoon. I next met this man, whose name I think is Hawkins, when I came down from the office. He waited for me. It was before lunch; I don't know the exact time. I could not give the hour. I next met him at the show that evening. I had tickets to one show, and he went to another one, and, if I remember right, it was right after the show, I am pretty sure. I met him at the Sherman Hotel. He called for me. The only way I can figure the time is by the show. I presume it was 11 o'clock.

"Q. Did you and he stay there until you went to bed? A. I think that we went to the North American Cabaret. That is a restaurant. We stayed there until they closed. They serve drinks there, and, if I remember right, they close or quit serving drinks at 1, and we were there half an hour or more after that. From there we went to the Sherman Hotel, if I remember right.

"Q. What time was it when you got to the Sherman Hotel? A. I don't know as you would call it that night. I was there next morning at 3 o'clock. I did not go to my room alone. I forget the name of the other person that was there. There was just we two."

He testified in the Eno case that the first night, Tuesday, he lost over $2,000. This was the 4th of May, and he had not drawn the money on any of the drafts. This testimony was manifestly untrue, as he could not have lost more than the balance of the $300 cash he took with him if he played on Tuesday. He swore that he cashed one draft each day, when in fact he cashed one on the 5th and two on the 6th of May. He testified on this occasion that he never commenced playing until about 3 o'clock in the morning. This was apparently to corroborate his statement that he had long been drinking with the supposed Hawkins, but it clearly appears that the bell man, on whom he relies to corroborate him, called at the room at 11:15 and they then appeared to have been gambling. If they had not, the whole transaction was a fraudulent pretense. The bankrupt swears he drank nothing but beer, and that he never drank anything but beer and wine; never drank distilled liquors. This made it necessary to swear it was late at night when he gambled with the man whose existence is known only to himself. The bankrupt testified in the Eno case that he had two brothers in Chicago. If there is anything he would be expected to know about, this is one. It clearly appeared he had only one there.

We have but touched upon some of the glaring inconsistencies and misstatements of the bankrupt, but we have said enough, as we think, to clearly show that both the referee and the District Court were justi-

fied in saying that the bankrupt was wholly unworthy of belief; that he never met the supposed Hawkins at all in Chicago and gambled with him;; but that the entire scheme was devised to assist him in swindling his creditors. Not only were the referee and District Judge so justified, but, if the case had been submitted to us, we would have found the same way. Good v. Kane, 128 C. C. A. 454, 211 Fed. 956; Schweer v. Brown, 64 C. C. A. 574, 130 Fed. 328; Seigel v. Cartel, 90 C. C. A. 512, 164 Fed. 691; In re Friedman (D. C.) 153 Fed. 939.

In the state of the record, there is no question of law for our consideration, and the petition to revise must be, and is, denied.