for forfeiture, and claimant brings error. Reversed.

Grinstead, Laube & Laughlin, of Seattle, Wash., and Thomas E. Davis, of Portland, Or., for plaintiff in error.

Thos. P. Revelle, U. S. Atty., and J. W. Hoar, Asst. U. S. Atty., both of Seattle, Wash.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

═══════════

## In re WALT.

(District Court, D. Minnesota, Fifth Division. February 15, 1927.)

**1. Bankruptcy ⬅136(7)—Turn-over order of referee in bankruptcy held justified by the evidence.**

Evidence on hearing on petition of trustee in bankruptcy *held* to justify referee's turn-over order.

**2. Bankruptcy ⬅136(2)—Refusal of referee in bankruptcy to open up proceeding which led to turn-over order held not abuse of discretion.**

Refusal of referee in bankruptcy to open up proceeding which led to turn-over order, and take further testimony from bankrupt as to what he claims became of proceeds of sales, *held* not abuse of discretion; bankrupt having been represented at the hearing by counsel, having had every opportunity to explain what he had done with his property, and there being nothing to indicate that he did not understand.

**3. Bankruptcy ⬅136(6)—Clear and convincing evidence of possession or control by bankrupt at time justifies turn-over order.**

To justify turn-over order, while the burden is on trustee to establish the fact that bankrupt had property belonging to his estate in his possession or under his control at the time of the order, nothing more than clear and convincing evidence is necessary.

**4. Bankruptcy ⬅136(10)—Correctness of turn-over order is not involved in contempt proceeding for bankrupt's failure to obey such order.**

Proceeding for contempt for failure of bankrupt to obey turn-over order does not involve correctness of referee's conclusion in issuing such order.

**5. Bankruptcy ⬅136(9)—Contempt proceeding for bankrupt's disobedience of turn-over order is for civil contempt.**

Proceeding for contempt for failure of bankrupt to obey turn-over order is for civil contempt.

**6. Bankruptcy ⬅136(12)—To commit bankrupt for contempt for not obeying turn-over order, court must be satisfied beyond reasonable doubt of his ability.**

Court must be satisfied, beyond a reasonable doubt, that bankrupt has ability to comply with turn-over order, before it is justified in committing him for contempt for failure to obey it.

**7. Bankruptcy ⬅136(9)—Bankrupt's sworn denial in contempt proceeding for disobeying turn-over order does not conclusively purge him.**

Sworn denial of bankrupt in contempt proceeding for failure to obey turn-over order, while evidence to purge him of contempt, is not conclusive.

**8. Bankruptcy ⬅136(9)—Bankrupt in contempt proceeding will be given the benefit of the court's doubt, in view of lapse of time, whether he has the money that he was ordered to turn over.**

The court, in proceeding for commitment of bankrupt for contempt for failure to obey turn-over order, being in doubt of his having in his possession or under his control the money which he should have turned over, in view of the length of time since such order, he will be given the benefit of such doubt.

In the matter of Ben Walt, bankrupt. Heard on order to show cause why bankrupt should not be committed for contempt for disobeying turn-over order, and on petition to review turn-over order. Order in accordance with opinion.

This matter was heard at special term on January 15, 1927, upon an order requiring the bankrupt to show cause why he should not be punished for contempt for failure to obey an order of Hon. William O. Pealer, referee in bankruptcy, dated July 26, 1926, requiring him to pay over to the trustee $2,-

500; also upon a petition by the bankrupt for a review of that order. Further testimony was taken and a further hearing had on February 4, 1926.

Arthur R. Smythe, of Duluth, Minn., for trustee.

McGilvery & Thompson, of Eveleth, Minn., for bankrupt.

JOHN B. SANBORN, District Judge. Ben Walt was a merchant at Virginia, Minn. On or about December 24, 1924, he turned over what he claims was all of his property to a trustee for his creditors. Thereafter an involuntary petition in bankruptcy was filed, and he was adjudged a bankrupt on March 19, 1925. W. A. Marin was appointed trustee April 17, 1925. On May 14th, following, the trustee petitioned for a turn-over order. Upon this petition, an order to show cause was served upon the bankrupt, returnable May 27, 1925. The bankrupt appeared personally and by counsel. A full hearing was had on April 5, 1926. The referee made findings in favor of the trustee, and on July 26, 1926, ordered the bankrupt to pay over to the trustee $2,500, which the referee found belonged to the estate and was then in the possession of the bankrupt.

The order has never been complied with. On December 7, 1926, the trustee petitioned this court for an order requiring the bankrupt to show cause why he should not be found to be in contempt for failure to obey the order, and be punished therefor. The order to show cause was returnable December 11, 1926. At that time, the matter was continued to January 15, 1927, at the request of the bankrupt. In the meantime, the bankrupt petitioned the referee for a rehearing and an opportunity to introduce further testimony to the effect that he had spent more money for household expenses than he claimed at the former hearing, and that he had lost money by gambling. This petition was denied. The bankrupt now petitions for a review of the original turn-over order and also the order denying a rehearing by the referee upon his recent application.

[1] Without deciding that the petition for review was filed in time, careful consideration of the evidence indicates that the referee was fully justified in making the order requiring the bankrupt to turn over $2,500. The evidence introduced by the trustee before the referee warranted the conclusion that the bankrupt, during the year 1924, from January 1st to December 24th, had and received a total of cash and merchandise of $29,073.37; that the total amount he received in cash from sales and all other sources was in excess of $24,854.76; that on December 24, 1924, when he suspended business, he had in his store merchandise of the value of $4,218.61. He accounted for total expenditures of $21,563.47, leaving a balance of $3,291.29 unaccounted for. From this the referee deducted $545, as representing outstanding checks on January 1, 1925, and also $246.29 to cover other contingencies, leaving $2,500 as the minimum amount which the bankrupt was withholding from his creditors on July 26, 1926. The referee was conservative in his estimate. It would be a fair assumption that the bankrupt sold his goods at a profit, and yet no profit is figured, because he testified that he sold at about cost. .

There can be but little doubt that the bankrupt failed to turn over all of his property or funds to his trustee, and that he held out at least the amount that the referee finds. The only doubt that could exist would arise from the lapse of time. That he had possession or control of this money in January, 1925, and on April 17, 1925, at which time the trustee in bankruptcy was appointed, is fairly certain. In the absence of any adequate explanation from him, the referee was still justified in concluding that he had it in July, 1926. In December, 1924, after he suspended business and turned his property over to a trustee for his creditors, his father-in-law took an assignment of the lease of the premises where his business was being conducted, and where he and his family lived. The father-in-law also subsequently purchased the merchandise from the trustee in bankruptcy, at a little more than half its cost, and the bankrupt is doing business, as heretofore, except that it is now claimed that the business belongs to his wife, who bought it from his father-in-law, and that he is employed at a salary of $25 a week by her. This situation did not make it any less probable that he retained possession or control of what he had in December, 1924.

[2] There was no abuse of discretion on the part of the referee in refusing to open up the proceedings which had led up to the making of the turn-over order. Mr. Walt was represented by counsel at the hearing, although not by the same counsel who represent him at the present time. He had every opportunity to explain what he had done with his property. There is nothing in the testimony to indicate that he did not understand the nature of the proceeding. The referee was not obliged to take further tes-

timony from Walt as to what he now claims had become of the proceeds of the sale of the merchandise during the year 1924.

Upon the hearing in this contempt proceeding, Ben Walt testified, under oath, that he did not have $2,500 at the time the turnover was made; that when he closed his business in December, 1924, he turned over everything except his own clothing; that he is working in the store at the present time for Pearl Walt, his wife; that his father-in-law bought the store and the stock of goods which he originally had; that this was done with money borrowed by his father-in-law from the banks; that he (Ben Walt) lives over the store, pays $50 rent for the upstairs, and $150 rent for the downstairs or storeroom; that he has four children, one a baby born in February, 1925; that he has had a maid to help his wife and the children, who have been sick; that they had measles and scarlet fever; that he cannot afford to pay a maid now; that he does not know what his household expenses are; that in the last year he has bought two suits of clothes for himself, one for $35 and one for $55, and an overcoat for $33.50; that he has paid $48 or $50 to his church; that he plays cards a little, but has not gambled since his bankruptcy; that his car fare amounts to 60 cents a day; that he pays $10 or $15 a month for charity; that he had a lease on this same building for some six years before bankruptcy; that it was assigned to his father-in-law; that he gets $25 a week for his salary, and keeps his family; that this is an arrangement between himself, his father-in-law, and his wife; that they have not paid the father-in-law for the stock yet; that he does not know what business he did in 1925 or 1926, and does not know what money he has; that the store is not on one of the best corners, but that it is a good business location.

Pearl Walt, the wife of the bankrupt, testified that she has been married 10 years and has four children; that, when Ben turned over his property, he did not have anything left; that she is operating the store, and owns the merchandise, and Ben manages it; that they pay $50 or $60 a month for grocery and butcher bills; that they have been paying a maid $25 a month; that they pay $10 a month for laundry; that their telephone bills are $5 a month, and newspapers $5 a month; that they pay about $11 a month for milk and cream, about $10 a month for eggs, $7 for gas and electricity, and $1.50 for water; that she thinks their living expenses are about $150 a month, not including the rent; that they have been under heavy medical expenses, and still owe $135 to the Duluth Clinic; that she has not yet paid for the expenses of the care of the children while they had scarlet fever and the measles; that the inventory of the store is $1,200 less than in 1926; that she does not know what the income of the store was; that she has paid back to her father $1,200 on account of what he advanced to purchase the stock of goods; that they owe between $4,000 and $5,000 on a $7,000 or $8,000 stock.

Henry Seigal, the father-in-law, testified that he has been for many years in the hide and cattle business, and is the father-in-law of Ben Walt; that in April, 1925, he bought the stock of goods which formerly belonged to his son-in-law from Mr. Marin, the trustee, for $2,400; that he kept the stock and the store for about a year; that Ben and his wife work there; that, in order to purchase the stock, he borrowed $2,400 from banks in Eveleth, $1,500 in one note, and $700 in the other note; the other $100 was his own money; that, so far as he knows, Ben had no money at the time he closed his business in 1924, and no way of making a living; that what he did, he did for the purpose of enabling his son-in-law and daughter to earn a livelihood and take care of themselves and children.

[3] The question, then, is whether, under the circumstances, the court should commit the bankrupt to jail as for contempt, until he complies with the turn-over order or until the further order of this court. It is difficult to determine what quantum of proof is necessary to justify a turn-over order, and the Circuit Court of Appeals of this circuit has apparently been somewhat reluctant to lay down any definite rule. It would appear from Henkin v. Fousek (C. C. A.) 246 F. 285, that the burden was upon the trustee to establish the fact that the bankrupt had money or property belonging to his estate in his possession or under his control at the time the turn-over order was made, by a fair preponderance of the evidence. In the case of Marin v. Ellis (C. C. A.) 15 F. (2d) 321, the question of the quantum of proof is left undetermined. At least nothing more than clear and convincing evidence is necessary in this circuit. Henkin v. Fousek, supra.

[4, 5] This proceeding now does not involve the correctness of the referee's conclusion in issuing the turn-over order, but is a proceeding for a civil contempt. Henkin v. Fousek, supra; Freed v. Central Trust Co. (C. C.

A.) 215 F. 873; Gompers v. Bucks Stove & Range Co., 221 U. S. 418, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; Boyd v. Glucklich (C. C. A.) 116 F. 131.

[6] In this circuit it appears to be the rule that the court must be satisfied, beyond a reasonable doubt, that the bankrupt has the ability to comply with the order, before it is justified in committing him for contempt for a failure to obey it. In Boyd v. Glucklich, supra, Judge Walter H. Sanborn, in his concurring opinion, says, speaking of the bankrupt, who has been required to turn over his property:

"He cannot escape an order for its surrender by simply adding perjury to fraudulent concealment or misappropriation. It is still the duty of the referee and of the court, notwithstanding his oath and his testimony, *if satisfied beyond a reasonable doubt* that he has property of the estate in his possession or under his control, to order him to surrender it to the trustee, and to enforce that order by confinement as for contempt."

[7] The sworn answers of the party charged with contempt are evidence to purge him thereof, but are not conclusive evidence. Whether or not the party charged has purged himself is to be decided upon a careful consideration of all the evidence produced for and against him. Boyd v. Glucklich, supra; In re Meier (C. C. A.) 182 F. 799; Good v. Kane (C. C. A.) 211 F. 956. It is therefore apparent that a sworn denial of the bankrupt in this case does not necessarily purge him of contempt for failure to obey the turn-over order. It is necessary, then, to consider the evidence which must form the basis for the conclusion that he now has the $2,500 in his possession, which he can deliver to the trustee.

The conclusion of the referee is necessarily based upon the fact that the bankrupt must have had possession of this property on the eve of his bankruptcy. The rule is that, when property of a bankrupt estate is traced to the possession of one on the eve of his bankruptcy, it is presumed to remain in his possession or under his control until he satisfactorily accounts to the court of bankruptcy for its disposition or disappearance, and the burden is upon him to so account. He cannot escape an order for its surrender by simply denying, under oath, that he has it, or that it is property of the bankrupt estate. Good v. Kane, supra. This presumption of the continuance of possession grows weaker as time elapses, until it ceases to exist. Marin v. Ellis, supra. And in order to determine the question presented here it is necessary to determine whether the presumption is now sufficiently strong to justify the court in saying that, beyond a reasonable doubt, Ben Walt has in his possession or under his control $2,500 which should have been turned over to the trustee in bankruptcy.

In Boyd v. Glucklich, supra, Judge Caldwell said:

"The referee's conclusion seems to have been reached mainly, if not altogether, by 'approximate' estimates, inferences, and conjectures, which, while they give rise to very strong suspicion, fall far short of direct and conclusive proofs. The sea of suspicion has no shore, and the court that embarks upon it is without rudder or compass. No man can be imprisoned for a constructive contempt on suspicion or conjectures, or upon inferences which may or may not be well founded."

In Stuart v. Reynolds (C. C. A. 5th Cir.) 204 F. 709, it was held that:

"A court of bankruptcy is without authority to make an order adjudging a bankrupt guilty of contempt for failure to obey an order of a referee requiring him to turn over property or money of the estate to his trustee, except on clear and convincing proof that he has present possession or control of the property or money and the ability to comply with the order."

The purpose of punishment for a civil contempt is not to vindicate the authority of the court making the order which has not been complied with, but to enforce compliance with the order for the benefit of the party bringing the proceeding. Gompers v. Bucks Stove & Range Co., supra; Kirsner v. Taliaferro (C. C. A.) 202 F. 51. This last case contains a very satisfactory discussion of the subject by Judge Rose, of the Fourth circuit. He says:

"It must be borne in mind that the form of the order in the case at bar was that the bankrupt should be imprisoned, not for a definite term as a punishment, but until he complied with the order by turning over the property in question to his trustees. It is because the order is so worded that the court must be satisfied of the present ability of the bankrupt to comply with it. It is easy to conceive of cases in which a bankrupt had so dealt with his property after he had been ordered to turn it over as to make it impossible for him to do so. In such case no such order as that passed below could properly be made against him, but for all that he might well be subject to punishment for the contempt of which he had been guilty. That punishment

would take the form of a fine of a definite amount or a committal to prison for a term of fixed duration. In the case of Gompers v. Bucks Stove & Range Co., supra, the Supreme Court said: 'The distinction between refusing to do an act commanded—remedied by imprisonment until the party performs the required act, and doing an act forbidden —punished by imprisonment for a definite term, is sound in principle, and generally, if not universally, affords a test by which to determine the character of the punishment.'

"The court instanced the case of a refusal to turn property over to a receiver upon the order of a court as an illustration of a civil contempt. It said that: 'Unless there were special elements of contumacy, the refusal to comply with the order is treated as being rather in resistance to the opposite party than in contempt of the court. * * * The order for imprisonment in this class of cases, therefore, is not to vindicate the authority of the law, but is remedial and is intended to coerce the defendant to do the thing required by the order for the benefit of the complainant. If imprisoned, as aptly said in Re Nevitt, 117 F. 461 (54 C. C. A. 635), "he carries the keys of his prison in his own pocket." He can end the sentence and discharge himself at any moment by doing what he had previously refused to do.' "

It was further said in that case by Judge Rose:

"We thoroughly agree with those courts which hold that, before a bankrupt may be committed for failure to obey an order to turn over property to his trustee, the court should be satisfied that he has present ability to comply. For many reasons the conviction that he has the power should be as nearly absolute as human conclusions ordinarily can be. We know no better way of stating the quantum of proof which should be insisted on than to say, as other courts have said, that it should be sufficient to establish the fact beyond reasonable doubt. Such a rule is required, not only for the protection of the liberty of the citizen, but for the preservation of the dignity of the court itself. It is not well that there should be many occasions in which, after sending a man to jail for refusing to obey an order, the court will feel constrained to release him without the order being obeyed. Unless the power of commitment as a means of compulsion is exercised only when there is no real question of the ability of the defendant to do what he is commanded, such an outcome will not be uncommon."

As has been pointed out by Judge Sessions in Re Haring (D. C.) 193 F. 168, there is one line of decisions to the effect that an order of the referee, adjudging that a bankrupt has in his possession and under his control certain specific property and requiring him to turn that over to the trustee, creates a presumption of his ability to comply with the order, and, where he refuses or neglects to comply, he has the burden of proving that he cannot do so, and is subject to being committed unless he can adequately explain what has become of the money and property. The other line of decisions is to the effect that the order shall be given such weight as it may be entitled to under all the circumstances, but that the court should make a new and independent investigation, considering all material facts and circumstances relating to what preceded as well as what followed the order, and, from such investigation and such evidence as may be presented, determine whether the order of the referee was justified, whether the bankrupt's disobedience is willful, and whether he has present ability to comply with the order; in other words, whether, under all of the existing circumstances, as shown by the record, the bankrupt should be committed as for contempt. See cases cited in Re Haring, supra.

The case of Samel v. Dodd (C. C. A.) 142 F. 68, seems to represent one extreme, and the cases of In re Weber Co. (C. C. A.) 200 F. 404, and In re J. H. Small Shoe Co. (C. C. A.) 16 F.(2d) 205, the other. The decisions in the Eighth circuit are not in harmony with the two decisions last mentioned, and, unless the court is satisfied, beyond a reasonable doubt, that a bankrupt has property in his possession or under his control belonging to the estate, an order committing him for contempt for failure to obey a turn-over order would not be sustained.

[8] The testimony which the bankrupt has offered as an excuse for not complying with the order of the referee is not convincing. I am of the opinion that he has been dishonest with reference to his creditors; that, if he was ordered to go to jail, he would probably find the $2,500 and pay it over. In fairness, however, I must admit that I am not morally certain that he now has possession or control of this $2,500, and that, if I made an order committing him for contempt, it would be upon my belief merely that he has it or can get it. It must be conceded that it is now two years since he failed, that he has a wife and children, and that they have been sick. Whether the business has

made money or not does not appear. The presumption that the bankrupt still has this money is not as strong as it was when the referee made his order. If the trustee had procured the turn-over order sooner, and had brought a contempt proceeding more promptly, the situation would be different. It is probable that the bankrupt has been guilty of concealment of assets and of false swearing; but, being in doubt as to the sufficiency of the evidence to justify a commitment for contempt, I shall give the bankrupt the benefit of the doubt.

The order to show cause will be discharged, and the order of January 18, 1927, entered prior to the last hearing, will be vacated and set aside.

It is so ordered.